**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

William Bourque

    v.                                                    Civil No. 06-cv-090-JM

Town of Hampton,
William L. Wrenn and
Daniel Gidley

**O R D E R**

    Plaintiff William Bourque ("Officer Bourque" or "plaintiff")
brought this action against defendants for their allegedly
retaliatory treatment of him, based on plaintiff's disagreement
with their handling of charges against third parties who had
assaulted plaintiff while he was on duty as a police officer in
the Town of Hampton, New Hampshire.  Plaintiff asserts that
defendants have engaged in conduct intended to intimidate and
harass him, in violation of his constitutional rights, and seeks
redress for those violations under 42 U.S.C. § 1983.  He also
asserts several pendent state law claims, based on the same
incidents.  Defendants move for summary judgment.  Plaintiff
objects.  After carefully considering the arguments on both
sides, for the reasons set forth below, defendants' motion for
summary judgment is granted.

Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one "that might affect the outcome of the suit."  Id. at 248.

In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the nonmovant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  The party moving for summary judgment "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the burden shifts to the nonmovant to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden,

2

could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citing Celotex, 477 U.S. at 323, and Anderson, 477 U.S. at 249).  While all reasonable inferences must be indulged in favor of the party opposing summary judgment, conclusory allegations, improbable inferences, or unsupported speculation are not sufficient to defeat summary judgment.  Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).  Summary judgment will be granted if a party bearing the burden of proof fails to establish an essential element of its case.  See Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo, 394 F.3d 40, 43 (1st Cir. 2005).

United States District Court for the District of New Hampshire Local Rule 7.2(b)(2) provides in pertinent part:

> All properly supported material facts set
> forth in the moving party's factual statement
> shall be deemed admitted unless properly
> opposed by the adverse party.

Fed. R. Civ. P. 56(e) makes clear what is necessary to "properly oppose" a motion:

> an adverse party may not rest upon the mere
> allegations or denials of the adverse party's
> pleading, but the adverse party's response,
> by affidavits or as otherwise provided in
> this rule, must set forth specific facts

showing that there is a genuine issue for trial.

In addition to affidavits, the adverse party may proffer deposition testimony, answers to interrogatories and admissions on file to defeat summary judgment.  See Fed. R. Civ. P. 56(c).

Facts

Plaintiff was and still is a police officer employed by the Hampton Police Department.[1]  In August 2003, plaintiff was assaulted and injured on the job.  Four of the individuals involved were charged.  The police prosecutor who investigated the incident, Sergeant Joseph Galvin ("Sergeant Galvin"), identified several problems with the case, including difficulty in identifying one of the primary assailants, who never was apprehended.  After several months of working on the case, Sergeant Galvin spoke with Hampton's Chief of Police, William L. Wrenn ("Chief Wrenn") about how he would like to proceed.  In May 2004, Chief Wrenn urged plaintiff to agree to reduced charges.

---

[1]Plaintiff filed an affidavit as Exhibit O as part of his opposition on February 16, 2007.  Document no. 9.  Because the filing was not in accordance with local rules on electronic filing he was ordered to refile.  In refiling, document no. 10, plaintiff failed to electronically include the affidavit as part of Exhibit O.  He has added it as an addendum.  Document no. 14.

Plaintiff refused.  The matter was resolved by a plea agreement in which all four defendants pled guilty.

Prior to these events, plaintiff asserts he had never been disciplined or investigated by the Hampton Police Department. Plaintiff now complains that his disagreement with the plea bargain caused a number of investigatory and disciplinary acts against him.  These acts are described below seriatim.

a.   Fire Department

Hampton Police Lieutenant Daniel Gidley ("Lieutenant Gidley") states that in November 2004, he observed plaintiff's cruiser in the parking lot of the fire station for at least an hour while plaintiff was on duty; that he verified that plaintiff was not at dinner; and that he spoke to plaintiff about spending excessive time at the fire department while on patrol.  See Defs.' Mot. Summ. J. (document no. 7), Br. in Support, Ex. 6, Gidley Aff. (document no. 7.6), ¶ 3.  For his part, plaintiff denies being spoken to about visiting the fire station until after he raised the subject with Lieutenant Gidley, but he did not factually controvert any of Gidley's affidavit except the allegation that the visit lasted an hour.  Plaintiff claims the visit lasted only twenty minutes.  See Defs.' Mot. Summ. J., Ex.

7, Pl.'s Ans. Interrogs. No. 7.  Plaintiff admits he was at the
fire station, but denies doing anything wrong or fraternizing
improperly with the firemen.  See id.; see also Pl.'s Summ. J.
Opp'n Mem. (document nos. 9, 10 and 14), Ex. O, Bourque Aff. ¶ 4.
There is, therefore, no genuine issue of contested material fact
as to his being at the fire department for twenty minutes to an
hour when he should have been on patrol.  Plaintiff was not
disciplined, nor is he alleged to have suffered any other adverse
consequences as a result of the incident.

     b.  Unshaven in court

    Lieutenant Gidley saw plaintiff unshaven during a court
appearance and reported it to another Hampton Police Lieutenant,
Richard Sawyer ("Lieutenant Sawyer").  See Gidley Aff. ¶ 4.
Officer Bourque does not deny the statement, but instead
characterizes it as unsubstantiated and damaging hearsay, made
for the sole purpose of harassing him.  See Bourque Aff. ¶ 6.  He
does not explain this analysis.  Plaintiff was not disciplined
for the incident.[2]  See ¶ 4.  This allegation does not raise any

_____

    [2]The significance of plaintiff appearing unshaven in court
is relevant to another incident not raised by plaintiff in this
action, pertaining to plaintiff's improper request for mileage
reimbursement, for which he was disciplined.  See Pl.'s Summ. J.
Opp'n Mem., Ex. R., Mar. 8, 2007 Deposition of Richard Sawyer
("Sawyer Dep.") at 10-14; see also Pl.'s Answer to Interrog. No.

genuine issue of material fact, because the facts are undisputed.

       c.   <u>Retaliatory Parking</u>

Plaintiff alleges that in March 2005, Lieutenant Gidley parked his police vehicle in the parking lot in such a way that it blocked plaintiff's vehicle from exiting easily. Lieutenant Gidley explains that due to snow accumulation, there were no spaces left; that he was at the station for 15-20 minutes; that he had taken care to block no one; and that at no time did plaintiff ask him to move his vehicle. Plaintiff counters that there were empty spaces in the lot and that Gidley had gone out of his way to block plaintiff's car. <u>See</u> Pl.'s Answer to Interrog. No. 8 (document no. 7.7). Both parties agree that snow was affecting how cars were parked that day. Although with difficulty, plaintiff did manage to exit his parking space. <u>Id.</u> Lieutenant Gidley states that plaintiff never asked him to move the vehicle, and plaintiff does not deny that. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> Gidley Aff. ¶ 5. Lieutenant Gidley first learned he had caused plaintiff difficulty when plaintiff filed a grievance form

---

10 (admitting one day suspension on 3/14/05). Plaintiff believed Lieutenant Gidley was behind the investigation into plaintiff's inaccurate mileage records. <u>See</u> <u>id.</u>, No. 7. Whatever instigated that investigation, the record indicates plaintiff in fact did abuse the mileage reimbursement policy, and there is no evidence that the initiation of that investigation was improper.

against him with the union.  See id.; see also Pl.'s Summ. J.
Opp'n Mem., Ex. E (3/27/05 letter from Hampton Police Association
to Chief Wrenn).  While the details of this incident are
disputed, the essential facts alleged do not prove that
Lieutenant Gidley intentionally blocked Officer Bourque in
retaliation for Bourque's previous refusal to comply with Chief
Wrenn's handling of the assault case.

       d.   Denial of Motor Vehicle Rove

    Plaintiff alleges a discriminatory denial of "rove" duty,
claiming he was denied it in retaliation for having filed a
grievance form with the union about Lieutenant Gidley blocking
his car in the parking lot.  See Bourque Aff. ¶ 7; see also Pl.'s
Summ. J. Opp. Mem., Ex. I (4/22/05 letter from Hampton Police
Association to Chief Wrenn).  Lieutenant Gidley states that the
purpose of the rove vehicle is to travel through town looking for
traffic violations.  He says plaintiff was denied this duty
"[b]ecause the plaintiff did not write tickets for motor vehicle
violations," leading Lieutenant Gidley to conclude that it "would
make more sense to assign someone else to the rove vehicle."
Gidley Aff., ¶ 6.  While the parties dispute the reasons for
plaintiff having been removed from rove duty, they agree that the

decision resulted in no loss of pay or hours or in any way constituted a demotion or other adverse employment action.

     e.  <u>Patrolling Outside His Area</u>

Plaintiff alleges that he was accused of patrolling outside his assigned area, but again does not support this allegation with any fact in his affidavit or any answer to an interrogatory. Lieutenant Gidley on the other hand, says he did find plaintiff parked with his lights off on a dead-end road, clearly out of his assigned patrol area.  Gidley Aff. ¶ 7.  Lieutenant Gidley further states that, when questioned, plaintiff explained he was in the area because reception for his phone service was better there.  Plaintiff was not disciplined for this incident.  <u>See</u> <u>id.</u> Those facts are uncontroverted.

     f.  <u>Mailbox Contraband</u>

Plaintiff next alleges that he was falsely accused of being untruthful about the date on which he placed a Viagra tablet in Lieutenant Gidley's mailbox.  Plaintiff states he had found the pill in his own mailbox and moved it to Gidley's box on March 12, 2005.  Lieutenant Gidley reported he had checked his box on the afternoon of March 12th and the pill was not there.  The incident came before Chief Wrenn, who believed Gidley and recommended that

plaintiff be terminated for being untruthful and for illegally disposing of a controlled substance.  See Pl.'s Summ. J. Opp. Mem., Exs. F & H (document nos. 10.6 & 10.8).  On June 3, 2005, plaintiff was suspended, with pay, pending an administrative hearing with the Hampton Department of Labor.[3]  At the hearing, plaintiff's counsel stated that the mailbox surveillance video from March 12th showed Gidley had not gone to his mailbox on that day.  As a result of the video, the disciplinary action was dismissed, the charges were removed from plaintiff's personnel file and he was allowed to return to work.[4]  See Pl.'s Summ. J. Opp'n Mem., Exh. L (document no. 10.12).  The facts surrounding this incident were established and are not now disputed.

Plaintiff contends Lieutenant Gidley lied, but that opinion is not substantiated by any evidence.  Chief Wrenn's assessment was that Lieutenant Gidley had been careless, not intentionally deceptive; Lieutenant Gidley was disciplined nonetheless.  See Pl.'s Summ J. Opp'n Mem., Ex. N (document no. 10.14).  Lieutenant

---

[3]The specific charges against Bourque were "insubordination, truthfulness, evidence management, unsatisfactory performance." See Pl.'s Summ. J. Opp'n Mem., Ex. H.

[4]The parties have not briefed the preclusive effect of the Department of Labor findings.

Gidley did misstate the date on which he had checked his mailbox. While Lieutenant Gidley might have lied about the date, it is at least as plausible that he simply forgot which day he went to his mailbox.  In the end, Lieutenant Gidley, not plaintiff, was disciplined.  Plaintiff's conclusory allegations of unfair treatment, unsubstantiated with any evidence, are insufficient to defeat summary judgment.

> g.   <u>Unauthorized Entries</u>

Plaintiff's last complaint alleges that Lieutenant Gidley made unauthorized entries in plaintiff's personnel file. Lieutenant Gidley's affidavit states unequivocally that he made no such entries.  Plaintiff's affidavit does not address the issue; consequently, Lieutenant Gidley's statement is deemed admitted.

Plaintiff also alleges that Lieutenant Gidley maintained unauthorized, illegal personnel files of various police officers, including plaintiff.  Again, plaintiff's affidavit is silent on this allegation.  Lieutenant Gidley's affidavit states that Hampton police lieutenants kept a log of rule infractions, as a method of tracking issues without the negative consequences of formally recording an infraction in an officer's personnel file.

<u>See</u> Gidley Aff. ¶ 9.  The practice has been discontinued and all documentation has been deleted.  These facts are deemed admitted because they are undisputed.

<u>Discussion</u>

Although the facts present some minor inconsistencies, no genuine issue regarding a fact material to the resolution of plaintiff's claims exists.  The question, therefore, is whether defendants are entitled to judgment as a matter of law.

Plaintiff brought this action under 42 U.S.C. § 1983, which imposes liability on public officials acting under color of state law who infringe the constitutional rights of private parties. <u>See</u> <u>Pagan v. Calderon</u>, 448 F.3d 16, 30 (1st Cir. 2006).  Although plaintiff has identified specific constitutional violations, the complaint couches them in terms of an over-arching pattern of retaliation taken in response to his refusal to drop the charges arising out of the August 2003 assault.  He attempts to weave his subsequent difficulties together with this thread of retaliation, but has failed to proffer the evidence needed to tie these disconnected incidents together to support, or raise a genuine dispute about, this alleged pattern of retaliation.

I.  First Amendment

Plaintiff asserts his First Amendment rights were violated by defendants' persistent harassment of him.  Plaintiff contends this retaliatory treatment violated his First Amendment rights in three distinct ways.  The first claim addresses the general pattern of retaliation which plaintiff argues began in 2004 because he refused to agree to Chief Wrenn's request that he drop the assault charges.  Plaintiff asserts this retaliation violated his to right to free speech.[5]  The second claim focuses on the harassment plaintiff alleges he was subject to after visiting the fire department in November 2004, in violation of his free association rights.  His third claim is based on the two grievance forms plaintiff filed with the union, which he argues defendants responded to by removing him from rove duty and pursuing the Viagra-related charges, in violation of his free speech rights.

It is well-settled that "government actions, which standing alone do not violate the Constitution, may nonetheless be

---

[5]Plaintiff does not provide any evidentiary support for his allegation that Chief Wrenn wanted to drop the case.  The record indicates that Chief Wrenn and Sergeant Galvin recognized the weaknesses of that case and, therefore, opted to resolve the matter with a plea bargain.

constitutional torts if motivated in substantial part by a desire
to punish an individual for exercise of a constitutional right."
Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (citing
authority); see also Oropallo v. Parrish, No. 93-1953, 1994 WL
168519, at *4 (1st Cir. May 5, 1994) (explaining how conduct done
in retaliation for exercising First Amendment rights is
actionable under § 1983).  To state a retaliation claim,
plaintiff must show "(1) constitutionally protected conduct, (2)
an adverse action by [government] officials 'sufficient to deter
a person of ordinary firmness from exercising his
[constitutional] rights,' and (3) 'a causal link between the
exercise of his constitutional rights and the adverse action
taken against him.'"  Mitchell, 318 F.3d at 530 (quoting Rauser
v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (internal quote
omitted)).  "[A] retaliatory state of mind typically is not
susceptible to proof by direct evidence that can be averred in a
complaint."  Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980)
(citing McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979)).
Retaliatory intent, however, can be inferred from the chronology
of the cited events.  See id.; see also Oropallo, 1994 WL 168519
at *4  (explaining how the challenged event must follow the

14

exercise of the constitutional right).

### A.  Plea Bargain for the 2003 Assault

Plaintiff first claims he was retaliated against for exercising his right to free speech when he disagreed with Chief Wrenn's decision about how to handle the August 2003 assault case.  The critical question here is whether plaintiff, as a public employee, engaged in speech that was protected by the First Amendment when he challenged Chief Wrenn's decision.  If plaintiff's statement is not protected by the First Amendment, then there was no exercise of a constitutional right and that ends the retaliation analysis.  See Mitchell, 318 F.3d at 530 (the threshold inquiry of a retaliation claim is whether the triggering conduct is protected by the Constitution).

As a public employee, plaintiff's speech may be limited by the government without offending the Constitution, provided the restrictions are necessary for the efficient and effective administration of the public service he was employed to provide. See Garcetti v. Ceballos, __ U.S. __, 126 S. Ct. 1951, 1958 (2006) (explaining how the government's interest in controlling its operations is balanced against the employee's interest in free speech).  Whether or not plaintiff's disagreement with Chief

Wrenn is afforded First Amendment protection involves a two-step inquiry.  See id. (citing Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968)).  First, did plaintiff, the employee, speak as a citizen on a matter of public concern?  If the answer is no, then the employee has no First Amendment claim on the employer's reaction to the speech.  Garcetti, 126 S. Ct. at 1958.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  Id. at 1960.  Restrictions on an employee's speech which occurs in the course of performing job responsibilities reflect the appropriate control the employer has over that which it created. See id.  This rule essentially allows public employers to evaluate their employees' job performance without raising constitutional concerns.  Id.

If the employee is speaking on a matter of public concern, however, then the second inquiry arises, which focuses on the competing interests of the speech and its consequences.  See id. at 1961 (comparing speech as a private citizen with speech as a public employee).  Under such circumstances, "the question

becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Id. at 1958.  If the employee is speaking as a "citizen[] about matters of public concern," the speech can be restricted only as much as is "necessary for the employer[] to operate efficiently and effectively," both to promote the provision of public service on the one hand, and to protect the employee's liberties and to foster public discourse on the other hand.  Id. at 1958-59.

Here, plaintiff's opinion about how the 2003 assault charges should have been handled was an expression about a matter of public concern.  See City of San Diego v. Roe, 543 U.S. 77, 83-84 (2004) (defining a matter of public concern as "something that is a subject of legitimate news interest . . . and of value and concern to the public").  Criminal charges concern the public and present issues critical to the public's safety and welfare.  See e.g. Press-Enterprise Co. v. Super.Ct. of Cal., County of Riverside, 478 U.S. 1, 13 (1986) (discussing how awareness of and access to the criminal justice system assuages community outrage and hostility towards violent crimes).  It is well-settled that "members of the public have a right of access to criminal

proceedings secured by the First Amendment."  <u>Tennessee v. Lane</u>,
541 U.S. 509, 523 (2004) (citing <u>Press-Enterprise Co.</u>, 478 U.S.
at 8-15, which extended the right of access to preliminary
hearings).

The fact that plaintiff voiced his opinion in a meeting with
his superior, or that his opinion related to his job, does not
remove the speech from the realm of "public concern."  <u>See</u>
<u>Garcetti</u>, 126 S. Ct. at 1959 (expressing views that were related
to the speaker's employment and were said inside the office,
rather than publicly, were both non-dispositive of the public
concern determination).  The controlling factor is whether the
opinion was expressed pursuant to plaintiff's duties as a police
officer.  <u>See</u> <u>id.</u> (finding speech done as part of employment
duties is the critical determination).  Plaintiff, however, had
no official role in prosecuting the charges.  Nothing in the
record indicates plaintiff's regular duties involved evaluating
or prosecuting cases for the Hampton Police Department.  His
objection to a <u>nol</u> <u>pros</u> is properly understood as the opinion of
the victim of the assault.  In that capacity, he spoke as an
ordinary citizen about a matter of public concern.

Plaintiff's claim, however, ends here.  Although the

critical speech pertained to a matter of public concern, his First Amendment rights were not violated because he was not treated differently, as a public employee, from any other member of the general public for having voiced his opinion.  See id. at 1958 (focusing on whether the government was justified in restricting its employee's speech compared to the freedom the general public enjoys).[6]  As an initial matter, plaintiff's argument that the cited examples of retaliation constitute the requisite unjustified differential treatment seems to assume that the "general public" here was limited to other officers in the Hampton Police Department, rather than the public at large.  Even assuming plaintiff can fairly make that distinction, his argument

_____

[6]Chief Wrenn fairly exercised his executive authority when he declined to follow plaintiff's opinion about how to handle the case.  See Multimedia Holdings Corp. v. Cir.Ct. of Fl., St. Johns Co., 544 U.S. 1301, 125 S. Ct. 1624, 1626 (2005) (recognizing the decisions to charge and to prosecute are the responsibility of the executive branch).  The record supports the conclusion that Chief Wrenn based his decision to plea bargain the 2003 assault charges after fully investigating and assessing the case.  Nothing in the record suggests that plaintiff's opinion was treated differently than any other citizen's opinion would have been.  Nor does the record raise a question of fact regarding whether Chief Wrenn would have made a different decision if another citizen, rather than plaintiff, had voiced the objection to his handling of the case.  Plaintiff simply was not treated "differently from any other member of the general public," Garcetti, 126 S. Ct. at 1958, when Chief Wrenn declined to follow plaintiff's desired course for resolving the assault case.

19

is unsupported by the factual record.

Each of the cited incidents fail to demonstrate an adverse
employment consequence that was caused by his objection to Chief
Wrenn's decision.  The investigation into plaintiff's mileage
record, which prompted Lieutenant Gidley's report about plaintiff
being unshaven in court, was caused by plaintiff, in fact,
abusing the mileage reimbursement policy.  The undisputed record
shows that plaintiff was disciplined for that conduct.  The other
cited incidents -- including time spent at the fire station,
being out of his patrol area while on duty, and mishandling
evidence by placing a Viagra tablet in Lieutenant Gidley's
mailbox -- again, were acts plaintiff admits having done, which
were inconsistent with police department rules, and for which he
suffered no adverse employment consequences.[7]  The most egregious
incident involved the Viagra tablet; however, the investigation
into that incident is too remote in time from plaintiff's May

---

[7]Although plaintiff was put on administrative leave during
the investigation into the Viagra incident, his suspension was
with pay and, when the investigation ended favorably for
plaintiff, he was reinstated at the same rank.  Without any
demotion or loss of pay, the record amply demonstrates he
suffered no adverse employment consequences from his mishandling
of evidence.  See Campagna v. Mass. Dep't of Envtl. Prot., 334
F.3d 150, 154-55 (1st Cir. 2003) (requiring allegation of
transfer, demotion or termination to show adverse employment
action).

2004 opposition to Chief Wrenn's decision to support any
inference of retaliation.  See Oropallo, 1994 WL 168519 at *4
(assessing the timing of the conduct and alleged consequence).
Plaintiff's final allegation charges that Lieutenant Gidley
intended to block him in the parking lot; however, that
conclusory allegation, which is not substantiated by the record,
is not sufficient to defeat summary judgment on plaintiff's
retaliation claim.

        The listed incidents demonstrate a pattern of plaintiff's
poor judgment, and the consequences suffered as a result, more
than they demonstrate defendants' retaliatory intent.  The
undisputed facts simply do not state a claim for a violation of
plaintiff's First Amendment right to free speech based on his
opposition to the plea bargain.  See Garcetti, 126 S. Ct. at
1958-60 (explaining how, to state a First Amendment claim, the
employee must have been treated differently by the employer for
having stated his opinion); see also Aponte-Torres v. Univ. of
P.R., 445 F.3d 50, 55 (1st Cir. 2006) (no First Amendment claim
where exercise of the constitutional conduct was not a
substantial or motivating factor in the adverse employment
decision).  Nothing in the record supports the reasonable

inference or conclusion that plaintiff suffered any adverse employment action, and thus was treated differently because he was a public employee than he would have been as a private citizen, for exercising his free speech rights.  Since plaintiff has not established, or raised a genuine dispute about, any element of a retaliation claim, defendants are entitled to judgment as a matter of law on this claim.

### B.  Fire Station Visit

Plaintiff next alleges his right to free association was violated when Lieutenant Gidley investigated plaintiff for having been at the Hampton Fire Station in November 2004.[8]  This claim fails for several reasons.

_____

[8]Plaintiff also asserts a vague claim for a violation of his right to associate with other police officers "because he was intentionally singled out amongst an entire police department; . . . the investigations . . . were posted publicly within the police department, [which] served to ostracize BOURQUE from his work associations."  Pl.'s Opp'n Mem. at 10.  Like the fire station interaction, this allegation also seems to refer to his desire to socialize and fraternize with colleagues.  That personal interest, however, without more, is not the type of association protected by the First Amendment.  See e.g. Connick v. Myers, 461 U.S. 138, 145 (1983) (explaining how the First Amendment protects speech concerning public affairs, "'to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people,'" (quoting Roth v. United States, 354 U.S. 476, 484 (1957), in contrast to speech related to internal office issues which government officials are given wide latitude to control).

First, fraternizing with firefighters is not the type of "free association" protected by the First Amendment.  <u>See McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 255-56 (2003) (explaining that the free association provision protects the right to political expression and association and extends to "a wide variety of political, social, economic, educational, religious, and cultural ends" (internal quote omitted)); <u>see also Wine & Spirits Retailers, Inc. v. Rhode Island</u>, 418 F.3d 36, 50 (1st Cir. 2005) (describing freedom of association as the protection of groups to pursue the guarantees of speech, assembly, petition and free exercise of religion).  By plaintiff's own admission, he associated with members of the Hampton Fire Department because of his personal friendship with them.  Second, it is undisputed that plaintiff was on duty at the time that he was socializing at the fire station.  Other than plaintiff's bald allegation of retaliation, nothing in the record undermines Lieutenant Gidley's justifiable questioning of why plaintiff was there when he should have been on patrol.  Third, plaintiff was not disciplined in any way for this transgression.

Plaintiff has not established any facts that demonstrate he was exercising his free association rights and then was

disciplined for properly exercising those rights.  Nothing about this incident remotely supports plaintiff's claim of retaliatory treatment.  See Mitchell, 318 F.3d at 530 (instigating conduct must be constitutionally protected and must cause the retaliatory action).  Defendants are entitled to judgment as a matter of law on this claim.

### C.  Grievance Form Filings

Plaintiff's final retaliation claim is based on the two grievance forms he filed.  He contends that the first grievance form, about Lieutenant Gidley intentionally blocking him in the parking lot, prompted Lieutenant Gidley to have plaintiff removed from rove duty.  Next plaintiff contends that the second grievance form, about having been taken off rove duty, caused Chief Wrenn to place plaintiff on administrative suspension and pursue charges for the Viagra incident.  Plaintiff argues that because the grievance forms were followed by adverse employment consequences, he was retaliated against for exercising his free speech rights, in violation of the First Amendment.[9]

---

[9]Although plaintiff asserts this retaliation claim as a violation of his free speech rights, it is better described as a violation of his right to petition the government for a redress of grievances.  See e.g. Martin v. City of Del City, 179 F.3d 882, 887 (10th Cir. 1999) (analyzing grievances directed at

While it is well settled that "'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,'" Garcetti, 126 S. Ct. at 1955 (quoting Connick, 461 U.S. at 142),

---

government employer under the petitions clause); see also Rendish v. City of Tacoma,123 F.3d 1216, 1221–22 (9th Cir. 1997) (discussing authority for analyzing public employee petition clause claims under the same rubric as free speech claims); see also Belk v. Town of Minocqua, 858 F.2d 1258, 1261 (7th Cir. 1988) (treating public employee's threat of filing a grievance as an exercise of the right to petition the government).  For purposes of resolving plaintiff's claims, the distinction is of little significance, however, because both the free speech clause and the petition clause are subject to the same analysis of whether the issue involved was a matter of public concern.  See Martin, 179 F.3d at 887–88 (citing McDonald v. Smith, 472 U.S. 479, 485 (1985) and Connick, 461 U.S. at 147, to explain that the petition clause enjoys no greater protection than the other clauses in the First Amendment, requiring public employee's petitions, like their free speech, to involve matters of public concern); see also Campagna, 334 F.3d at 154 (citing Boyle v. Burke, 925 F.2d 497, 505 (1st Cir. 1991) for same rule that the "public concern" doctrine applies to both free speech and petition clause claims); see also Adair v. Charter Co. of Wayne, 452 F.3d 482, 492 (6th Cir. 2006) (finding no claim for either a free speech or a petition clause violation, because public employees do not have "the right to file lawsuits to redress grievances without commenting on matters of public concern"); see also Rendish, 123 F.3d at 1222 (listing authority for rule that the "public concern" doctrine applies to both free speech and petition clause claims).  Whenever the claim involves a reaction to government employee speech, the analysis begins by assessing whether the speech involved a matter of public concern and, if it does, balancing the State's needs as employer to efficiently and effectively operate with the employee's rights as a citizen to express him/herself.  See Connick, 461 U.S. at 142–46 (discussing history of public employee's First Amendment rights).

when the "employee expression cannot be fairly considered as
relating to any matter of political, social, or other concern to
the community, government officials should enjoy wide latitude in
managing their offices, without intrusive oversight by the
judiciary in the name of the First Amendment."   Connick, 461 U.S.
at 146.   Here, plaintiff's retaliation claim involves exactly
that type of expression.

The grievance forms addressed only difficulties plaintiff
himself was having with other police officers, Lieutenant Gidley
in particular.  Such speech, limited to the internal affairs of
the Hampton Police Department, does not involve a matter of
public concern to invoke protection by the First Amendment.  See
id. at 147-48 (explaining that whether speech addresses a matter
of public concern must be determined by the "content, form, and
context of a given statement"); see also Vickowski v. Hukowicz,
201 F. Supp. 2d 195, 200-01 (D. Mass. 2002) (rejecting
retaliation claim based on termination following filing of
grievance and subsequent lawsuit because plaintiff police
officer's underlying complaint involved only his own discipline
and suspension, which were not matters of public concern).  "We
hold only that when a public employee speaks not as a citizen

26

upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick, 451 U.S. at 147.

Since plaintiff's complaints involved only his difficulty getting out of a parking space and his not being assigned rove duty, they do not rise to the level of public concern garnering First Amendment protection.  While the analysis ends there, it bears noting that nothing in the record supports his claim of adverse employment action as a result of filing the grievance forms, either.  The undisputed facts were that rove duty is simply one of several duties that could be assigned on any shift, that not doing rove duty did not result in any less pay or fewer privileges, or cause any other consequence that reasonably could be understood as adverse.  The undisputed facts also showed that plaintiff was placed on administrative suspension because he, in fact, put the Viagra tablet into Lieutenant Gidley's mailbox, in contravention of police department policy about handling evidence.  It was uncontroverted that plaintiff was fully

reinstated, with the charges deleted from his personnel file, after the surveillance tapes proved that Lieutenant Gidley, not plaintiff, had gotten the date wrong.  Based on these facts, plaintiff has failed to show any retaliatory treatment.  See Campagna, 334 F.3d at 154–55 (dismissing claim where no adverse employment actions taken response to exercise of First Amendment right); see also Nethersole v. Bulger, 287 F.3d 15, 19 (1st Cir. 2002) (explaining that defendant can defeat the claim, even if retaliation was a motivating factor in plaintiff's treatment, if defendant can prove that the adverse employment action would have resulted regardless of the protected conduct).

Nothing in the record gives rise to the inference, or raises a genuine dispute about, plaintiff's grievance forms having been a substantial or motivating factor in defendants' subsequent decisions.  Plaintiff has failed to show that any action was taken against him because he exercised his right to file grievance forms.  "[W]hile the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'"  Garcetti, 126 S. Ct. at 1959 (quoting Connick, 461 U.S. at 154).  Defendant is entitled to judgment as a matter of law on the First Amendment

claim based on filing of the grievance forms.

## II.  Fourteenth Amendment Due Process

Plaintiff's second and third claims are that defendants' protracted harassment and intimidation of him, allegedly demonstrated by the incidents set forth above, were a "deliberate violation" of his substantive and procedural due process rights guaranteed by the Fourteenth Amendment.  Plaintiff collapses his substantive and procedural due process arguments into one general complaint about the Viagra-incident investigation.  Specifically, plaintiff asserts the charges and investigation stigmatized him, which infringed his liberty interest in continued employment.  He further contends the administrative hearing process was tainted, because information from his confidential personnel records was leaked to the press, which exacerbated the damage to his reputation and denied him an impartial hearing.  Plaintiff asserts defendants' "malevolent campaign" to "ex-communicate" him and terminate his employment constituted the type of arbitrary and capricious government action that violates the due process clause.

The Supreme Court has held that the Due Process Clause protects individuals against two types of government action.

First, "'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" <u>U.S. v. Salerno</u>, 481 U.S. 739, 746 (1987) (discussing the Fifth Amendment due process clause (internal quotations omitted)). Second, government action that deprives a person of life, liberty or property but survives substantive due process scrutiny still must be implemented in a fair manner.  <u>See</u> <u>id.</u>  This requirement traditionally has been referred to as "procedural" due process. <u>Id.</u>; <u>see</u> <u>also</u> <u>DePoutot v. Raffeally</u>, 424 F.3d 112, 117 (1st Cir. 2005) (explaining the due process clause of the Fourteenth Amendment applies the same restrictions on municipalities and municipal agencies).  One does not turn to the procedural due process question until the substantive due process claim is addressed.

### A.  Substantive Due Process

To succeed on the substantive due process claim plaintiff must prove that the conduct shocks the contemporary conscience <u>and</u> that the employer deprived him of a protected interest in life, liberty or property.  <u>See</u> <u>Pagan</u>, 448 F.3d at 32.  When, as is the case here, the claim challenges executive action, any

30

abuse of power is not necessarily a constitutional tort.
See DePoutat, 424 F.3d at 118.  "Conscience-shocking" means
extreme and egregious, or truly outrageous, uncivilized or
intolerable.  See Pagan, 448 F.3d at 32 (citing authority).
"Mere violations of state law, even violations resulting from bad
faith," do not invariably amount to conscience-shocking behavior.
DePoutot, 424 F.3d at 119.  The conduct must be "stunning."  Id.

Plaintiff argues the public accusations that he possessed a
controlled substance constitutes conduct that "shocks the
conscience."  While news articles that were published regarding
this incident reported the event involved allegations of "an
illegal disposal of a controlled substance," those articles do
not identify plaintiff by name.  There are no affidavits or
interrogatory answers which authenticate the press reports or
provide any evidence that any of the defendants made such a
statement about plaintiff.  The unauthenticated complaint
references "contraband" in plaintiff's mailbox.  In short, there
is no evidence of any act by any defendant to support plaintiff's
claim that they intended to stigmatize him or otherwise hinder
his career.  Nothing in the record supports a finding that
defendants treated plaintiff so outrageously that the conduct

"shocks the conscience."   See id. (comparing examples of conduct
that was conscience shocking with conduct that was not); see also
Pagan, 448 F.3d at 32-33 (emphasizing how even disquieting or
unlawful conduct does not necessarily clear the high hurdle of
extreme egregiousness required to "shock the conscience").

     Even if defendants' conduct had shocked the conscience,
plaintiff has not alleged facts that could be construed as
violating any interest protected by the due process clause.  As a
matter of law, a suspension with pay does not constitute a
violation of  plaintiff's liberty interest.  The Supreme Court
has recognized that "a complete prohibition of the right to
engage in a calling" violates one's liberty interest in choosing
a field of private employment.  Conn v. Gabbert, 526 U.S. 286,
291-302 (1999).  There may also be a liberty interest that
extends to a suspension without pay.  See Moran v. Clarke, 296
F.3d 638, 645 (8th Cir. 2002) (en banc) (acknowledging right to
engage in work without unreasonable interference and harassment).
However, a police officer temporarily suspended with pay does not
have a damage claim for deprivation of his liberty.  See
Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir. 1984)
(rejecting notion that every police officer misconduct charge

that becomes part of a personnel file gives rise to liberty interest violation claim).

To defeat defendants' motion for summary judgment, plaintiff needed to proffer some evidence which at least raises a genuine dispute about whether defendants' treatment of him shocks the contemporary conscience and, in so doing, deprived him of a protected liberty interest.  See DePoutot, 424 F.3d at 118 (requiring conscience shocking conduct before recognizing a constitutional right to be free from such conduct).  Since plaintiff has failed to make a showing on either element of his substantive due process claim, that ends the matter.  See id. Defendants are entitled to judgment as a matter of law on the substantive due process count.

### B.  Procedural Due Process

To establish a procedural due process violation, plaintiff must identify a protected liberty or property interest and show that defendants deprived him of that interest without adequate process.  See Aponte-Torres, 445 F.3d at 56.  Plaintiff claims defendants' false accusations that plaintiff misrepresented the date of the Viagra incident, and that Viagra was a "controlled substance," stigmatized him, violating his liberty interest in

continued police employment.  He then asserts that the hearing process was "tainted . . . in such a fundamental way" by the leak to the press that it was constitutionally inadequate.  The undisputed  record does not substantiate either part of plaintiff's procedural due process claim.

Plaintiff does enjoy a liberty interest in the individual right "to engage in any of the common occupations of life" like being a police office.  See Conn, 526 U.S. at 291 (citing Bd. of Regents v. Roth, 408 U.S. 564, 572 (1972) which described general personal freedoms protected by the concept of liberty).  He also correctly asserts that his continued employment could not be jeopardized by false and stigmatizing accusations.  See Roth, 408 U.S. at 573.  "'[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'" Id. (quoting Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971)).

The uncontested facts demonstrate, however, that plaintiff was given notice of the charges against him and an opportunity to refute them.  He was afforded a hearing.  He had counsel.  He prevailed and the charges were dismissed.  All record of the

34

investigation was removed from his personnel file.

These undisputed facts show that even assuming, without finding, that the Viagra incident did stigmatize him, he was afforded constitutionally adequate process and, in fact, was not deprived of any liberty interest.[10]  Being suspended with pay during the course of the investigation cannot be understood as foreclosing employment opportunities in violation of plaintiff's liberty interest in being a police officer.  See Roth, 408 U.S. at 573-74.  Although plaintiff contends the press leak tainted the fairness of the hearing procedure, the facts do not support that allegation.  The process clearly protected plaintiff's interests, because he was exonerated and continues to work as a Hampton police officer.  Defendants are entitled to judgment as a matter of law on the procedural due process claim.

IV.  Equal Protection

Plaintiff's fourth claim is that defendants specifically targeted him with their harassment and intimidation, in violation

_____

[10]While plaintiff does not claim to have had a property interest in his job with the Hampton Police Department, the uncontroverted facts clearly show the process he received would have been adequate to protect such an interest.  See Roth, 408 U.S. at 577 (explaining that if a person has a legitimate claim of entitlement to a property interest, it cannot be taken away without an opportunity for the person to be heard).

of his equal protection rights guaranteed by the Fourteenth
Amendment.  Plaintiff asserts he was arbitrarily and maliciously
singled out, from other similarly situated police officers in
Hampton, for no rational reason.  He contends this treatment was,
again, in response to his initial refusal to agree with Chief
Wrenn about how to handle the 2003 assault charges and his
subsequent complaints to the union regarding the alleged
resulting harassment.

The Equal Protection Clause of the Fourteenth Amendment is
essentially a direction that "'all persons similarly situated
should be treated alike.'"  Pagan, 448 F.3d at 34 (quoting City
of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).
It can be invoked to challenge the way a police department, as
part of the executive branch of government, treats individuals.
See id. (explaining "[i]ts protections extend to both legislative
and executive conduct").  To defeat summary judgment, plaintiff
must establish that, or raise a genuine issue of fact about
whether, (1) he was treated differently from others similarly
situated, and (2) such selective treatment was based on an
impermissible consideration such as race, religion, intent to
inhibit or punish the exercise of constitutional rights, or

malicious or bad faith intent to injure a person.  See Aponte-Torres, 445 F.3d at 57 (citing authority).  Although plaintiff argues he was "singled out" in retaliation for exercising his First Amendment rights, with a malicious intent to injure him, there is no evidence to support his claim of disparate treatment based on such impermissible considerations.

First, the evidence shows that plaintiff, in fact, was not treated differently from all other Hampton police officers.[11]  As discussed at length above, defendants' treatment of plaintiff did not violate his First Amendment rights.  Accordingly, plaintiff cannot establish that he was treated differently because he exercised his fundamental rights to free speech, association, or to petition the government for a redress of grievances.

Second, the evidence completely undermines plaintiff's claim that defendants treated him differently because of a malicious or bad faith attempt to injure him.  It is uncontested that he did spend time at the fire station when he was supposed to be on

---

[11]It is questionable whether those "similarly situated" to plaintiff reasonably are all other Hampton police officers rather than the other Hampton police officers who were subject to disciplinary action because their conduct violated department rules and policies.  Because that distinction is not necessary for the disposal of this count, I will accept plaintiff's claim that he should be considered "similarly situated" to the entire Hampton Police Department.

patrol.  It is uncontested that he did appear unshaven in court.
It is uncontested that he was found out of his patrol area.
Plaintiff did not refute with any evidence defendants' reasonable
explanation of the parking lot incident.  Plaintiff has not
provided any evidence that he was denied "rove" patrol duty for a
retaliatory purpose.  He admits that he placed a Viagra tablet in
the mailbox.  None of those matters was denied or disproven.  The
fact that plaintiff's superiors noticed this behavior and
notified him that the incidents were not within the normal course
of his duties is neither surprising nor in any way irrational or
unconstitutional.

Finally, plaintiff argues he was unfairly treated when Chief
Wrenn initially believed Gidley as to when he checked the mailbox
and thought plaintiff had not been truthful about the incident,
which led to the administrative suspension and perceived damage
to plaintiff's reputation.  Plaintiff seems to argue the code of
conduct and hearing process were not applied to him as they were
to other officers.  Nothing about this series of events, however,
supports plaintiff's claim that he was treated differently from
other Hampton police officers, in bad faith, or investigated for
no rational reason.

38

Chief Wrenn's conclusion that Lieutenant Gidley was more credible than plaintiff was rationally supported by the record of plaintiff's conduct while on duty.  When plaintiff proffered evidence proving he correctly recalled the contested date, Chief Wrenn considered it and, ultimately, agreed with plaintiff, dismissing the charges against him and fully reinstating him.  By comparison, Lieutenant Gidley was disciplined for incorrectly reporting when he checked his mailbox, because his command position required a "standard of efficiency" that did not tolerate carelessness.  <u>See</u> Pl.'s Summ. J. Opp'n Mem., Ex. N. Unlike plaintiff, who never lost any pay, Lieutenant Gidley was suspended for one week without pay.  Under such circumstances, the facts simply cannot support a claim of disparate treatment of the two police officers, or unequal application of the department's rules of conduct.

Plaintiff has failed to adduce any facts which support his equal protection claim to defeat defendants' motion.  Defendants, therefore, are entitled judgment as a matter of law that they did not violate plaintiff's equal protection rights.

V.   § 1985 Violation

Plaintiff also asserts that defendants conspired to deprive him of his constitutional rights, in violation of 42 U.S.C. § 1985.[12]  To establish a claim for a § 1985(3) violation, plaintiff must prove that "'the conspiratorial conduct of which he complains [was] propelled by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."'" Diva's Inc. v. City of Bangor, 411 F.3d 30, 38-39 (1st Cir. 2005) (internal quotations omitted).  Plaintiff is not a member of a suspect class.  See Pagan, 448 F.3d at 35-36 (explaining "invidious discrimination" means discrimination against classes based on race, gender or religion).  And the uncontroverted record clearly demonstrates that, while he may not have liked his treatment, plaintiff was not discriminated against by defendants. Under the circumstances, defendants are entitled to judgment as a matter of law on plaintiff's § 1985 claim.  See Diva's Inc., 441

_____

[12]In relevant part, this statute provides:
"If two or more persons . . . conspire . . . for the purpose of depriving . . . any persons or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."  42 U.S.C. § 1985(3).

40

F.3d at 39 (affirming dismissal of § 1985(3) claim where plaintiff could not show membership in a suspect class).

<u>VI.  Pendent State Law Claims</u>

Having found that defendants are entitled to judgment as a matter of law on all of plaintiff's federal claims, the only remaining claims are those based on state law.  Under such circumstances, it is well within the court's discretion to decline to exercise its supplemental jurisdiction.  <u>See</u> 28 U.S.C. § 1367(c)(3) (providing for district court to decline to exercise its jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction"); <u>see</u> <u>also</u> <u>DePoutot</u>, 424 F.3d at 122 (affirming district court's dismissal without prejudice of the remaining state law claims); <u>see</u> <u>also</u> <u>Camelio v. Am. Fed'n</u>, 137 F.3d 666, 672 (1st Cir. 1998) (requiring district court to reassess its jurisdiction over state law claims after the foundational federal claims are dismissed).  Given the "pragmatic and case-specific . . . variety of considerations," <u>id.</u>, including the fact that plaintiff has alleged four counts based on state law, in the interest of fairness to the parties and comity, I conclude that the continued exercise of this court's supplemental jurisdiction over the

remaining claims is not warranted.  Accordingly, those claims are dismissed without prejudice to refiling in a court of competent jurisdiction.

Conclusion

For the reasons set forth above, defendants' motion for summary judgment (document no. 7) is granted as to counts 1, 2, 3, 4 and 9 of plaintiff's complaint.  Counts 5, 6, 7 and 8 are dismissed, without prejudice.  The clerk is ordered to close the case.

**SO ORDERED.**

_____

James R. Muirhead
United States Magistrate Judge

Date: May 30, 2007

cc:   Thomas J. Gleason, Esq.
      William G. Scott, Esq.